UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

#04-10550-WGY

JACQUELINE LASSITER

v.

PLAINTIFF'S AFFIDAVIT IN SUPPORT
OF OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

KIMBER ANDERSON ET AL.

I, Jacqueline Lassiter, depose and say that:

1. I am an African American female citizen of the United States and the plaintiff.

2. The former employer, Fleet Bank, placed me in the position of a Teller, assigned to its branch at Exeter Plaza (hereinafter referred to as "Exeter Plaza") after the hiring in February, '01.

3. Defendant Brian Gibbs, a white male, was the Manager and person in overall charge of the Branch during my tenure there.

4. As part of my duties as a Teller, I had daily contact with customers who would approach the Window to which I was assigned, to transact business.

5. It was part of the procedure of the employer to have officials of the bank, enter a Teller's line, ostensibly to transact business, as an every day customers, but, in fact, to monitor the manner in which the Teller comported herself, to assess her compliance with bank regulations and procedures.

6. It appears that the District Manager, Mr.Dolan, did in fact enter my line, during the early phases of my employment for that purpose and drew a favourable impression of my work.

7. After I had been in the position for a few weeks, Mr.Dolan, approached me while I was at the Window and complimented me on the performance of my duties.

8. Defendant Gibbs, a short time later, informed me that the District Manager, Mr.Dolan, wanted me to participate in a "Focus Group" which was to be convened at the Federal Street headquarters.

9. One of the primary purposes of the Focus Group, we were informed, was to have Teller discuss issues and problems which they faced in executing their duties and to permit them, to better perform their work.

10. We (the Tellers) were told that there was "Confidentiality" with respect to the matters that were discussed and that we could speak our minds freely; without worrying about our views being reported to officials at the branches where we worked.

11. On the very next day after my attendance at and participation at this Focus Group, defendant Gibbs summoned me into his office.

12. In his office, Gibbs, in a harsh tone of voice, upbraided me with the

statement, in sum and substance, that "whatever happens in Exeter, stays in Exeter".

13. I queried defendant Gibbs as to what he meant by that statement.

14. He responded by saying, in sum and substance "You know exactly what I mean".

15. The scolding from Mr.Gibbs left me with the definite impression that he took offense with something that I was reported to have said during the course of the proceedings in the Focus Group, of the previous day and that he (Gibbs) felt that my remarks had, at the very least, put him in a bad light with other officials of the Bank.

16. The remarks also caused me to realize that Gibbs, at best, would not be friendly or open-minded to me in the performance of my work and that I could not expect non-discriminatory treatment from him.

17. At some time in perhaps March or April, '02, Gibbs came to me while I was working at the Window and summoned me to report to his office.

18. When I entered Gibbs' office, I saw defendant Kimber Anderson, a white female, in the office.

19. Gibbs told me in sum and substance that "we want you to connect to the Tellers" and, that "the Tellers felt that you are not connected".

20. I asked Gibbs to explain what he meant.

21. Gibbs did not give me an explanation and essentially repeated that "we want you to connect to the Tellers".

22. Defendant Anderson joined in by saying, in sum and substance "we want you to assume a leadership role so that you can help the Tellers". We want you to teach them how to prepare a "Warm-Up" and to make sure that the Tellers minimized their mistakes.

23. I believed that Anderson, in using the term "Warm-Up" was referring to the/a Staff Meeting which would be convened at the beginning of the day and would last approximately 15-20 minutes.

24. When Gibbs used the pronoun "we", I understood that he was making reference to defendant Anderson and himself and that she concurred in his remarks.

25. At no time did defendant Anderson say anything to disassociate herself from Gibbs' remarks.

26. In light of Gibbs'overt antipathy toward me, in retaliation for my apparent criticism of Gibbs and of supervisory practices and procedures at Exeter Plaza, which I was encouraged to comment with an assurance of confidentiality and of freedom from reprisal, I viewed the orders of Gibbs and Anderson, that I "connect" with the Tellers, to be part of an effort of both of these individuals to make the performance of my duties, difficult, at the very least, and, an indication that they, would subject my work and me to very close scrutiny.

27.Further, their refusal to explain to me what they meant by their orders, I interpreted to be a deliberate attempt to leave me confused so that I would not know how to carry out their orders and thus leave myself open to a charge that I had refused to obey their orders and that I was improperly carrying out my duties.

28. There was also an undercurrent, in this session, that these white supervisors had taken offense, because, I, an African American, had dared to expose to persons at headquarters, supervisory shortcomings at Exeter Plaza.

29. My experience, as an African American, is that white persons in positions of authority, do not take happily to having their performance critiqued or criticized by subordinate African Americans.

30. My views as to the motivation of the defendants in summoning me to Gibbs' office were confirmed when, on the following day, Gibbs again called me to his office.

31. In the presence of Anderson, Gibbs told me, in sum and substance, that "we talked to you yesterday on connecting with the Tellers and you have not connected".

32. I asked them what they meant.

33. They refused to give me any explanation. This action was repeated the next day.

34. At some time in April, '02, Anderson gave me a written warning in which she criticized my attendance, punctuality and teller differences.

35. I told Anderson that I would not sign the document, because I disagreed with the contents.

36. I told Anderson that the times were wrong and that I had to examine by Time Sheets.

37. Anderson told me that she thought that the Sales Representatives and Tellers had to report at the same time; 9:30 a.m.

38. Anderson was mistaken, as Tellers were supposed to be at the Branch, fifteen minutes after the Sales Representatives.

39. When I told Anderson this, she said that she would correct the notations on the document.

40. Approximately one week after this meeting, I was summoned to Gibbs'office, where Anderson was present.

41. Gibbs handed me a warning, in which my attendance, punctuality and Teller differences were criticized.

42. Upon examining the document, I realized that the errors with respect to my time for reporting to work, had not been corrected by Ms.Anderson, as she had said that she would.

43. At this point, I was so frustrated and fed up with the harassment by Gibbs and Anderson and realizing that protesting was pointless, that I simply signed the document and left the room.

44. It was my practice, at the end of the day, to check my records and attempt to reconcile.

45. The Teller differences, as I remember them, were within the officially acceptable limit.

46. I was surprised at the claims of the defendants that my Teller differences were over the limit.

47. I did not believe that Gibbs and Anderson were being fair to me and felt that they would not assist me in my attempt to show that I was not responsible for the

sum of Teller differences which they attributed to me.

49. On more than one occasion, when I tried to inspect the Teller tapes, which were stored in the back room of the Branch, Anderson would tell me that I could not look at them. She would tell me that the Courier was on his way to get them. Therefore, I was deprived of the opportunity to check my alleged Teller differences against the Teller tapes.

50. There were occasions when I worked at the Copley Branch, where there was a black woman, Anne LNU,who was a supervisor.

51. I asked her what I could do if I felt that my supervisors were unfairly charging me with Teller differences.

52. Anne told me that I should speak to a woman named "Pam", who I believe to be a Pamela Menaud; and provided me with a telephone number.

53. I did telephone Pamela Menaud and explained to her that I was being charged unfairly, with Teller differences. I did give her my Teller identification number.

54. Ms.Menaud then told me that Kimber Anderson had told her to apply the differences of Nelson Velez, (a white male individual who worked at Exeter Plaza) to me.

55. Ms.Menaud told me to check the Teller tapes when I returned to the Branch.

56. Upon my return to Exeter Plaza, I made attempts to leave the Window to go to the back room to check the Teller tapes.

57. Anderson came to me, raising her voice, and saying in sum and substance,ordering me "...get back to your station ... I don't pay you to be in here... You are on my time now.."

58. When I told Anderson that I was trying to find the Teller tapes, she told me, in sum and substance " .. do that on your own time..."

59. I told Anderson that she did not want me to know the truth and that it was discrimination.

60. After the notification that I was terminated, I sent a writing to defendant Gibbs, a copy of which is annexed as Exhibit A, in which I did explained that I did telephone the Branch on the morning on which I did not report to work and that I did tell the person who answered the telephone, that, in fact, I would not report to work. I also stated in the writing that that was the practice at Exeter Plaza.

61. The employer did not provide me with a writing, around the time of the termination, setting forth the official reasons for the termination.

62. I did telephone Mr.Gibbs, at the Branch, after the termination and spoke to him, recounting the series of incidents with Ms.Anderson, as more fully explained above, and expressing my view that Ms.Anderson was racially motivated in her acts of harassment.

63. Gibbs responded by saying, in sum and substance that ".. he did not think so"; and promised that he would get back to me.

64. Approximately two weeks later, Gibbs telephoned me at home and expressed that he agreed with the termination.

65. The bank's Affirmative Action Policy Statement, Exhibit B, annexed, clearly places a responsibility on supervisory officials, such as Managers, like Gibbs, to enforce its provisions which require fair employment practices and posit that the

employer and its agents would not subject to retaliation, any person who availed herself of its provisions.

66. Gibbs was made aware, through my conversation with him, after the separation, of the series of incidents in which Ms. Anderson subjected me to racial discrimination, racial harassment and retaliation, because I had protested against her discriminatory actions toward me.

67. Under the provisions of the Affirmative Action Statement and the provisions of the Employee Handbook, excerpts of whose provisions on "Affirmative Action/Equal Employment Opportunity" are annexed as Exhibit C, the employer and its agents, certainly supervisors, had an obligation to investigate allegations of r acial discrimination, promptly, fairly and vigourously and to take corrective action, as required.

68. The employer, has provided me with what it purports to a "complete" copy of my Personnel File.

69. There is not a single document in the Personnel File, which shows that the employer or Gibbs or Anderson, ever investigated my charge that Anderson had subjected me to racial discrimination, harassment and retaliation.

70. In fact, far from complying with the requirements of the employer's Affirmative Action Statement, the employer and Gibbs, (who signed the Bank's Answers To Interrogatories of Plaintiff, Exhibit D, annexed and incorporated) assert that I never complained of racial discrimination, racial harassment or discrimination.

71. The provisions of the Employee Handbook do not specify that complaints of discrimination must be or should be made in writing.

72. In fact, the employer has never made me aware of any pre-printed Form, on which employees, such as I, could register complaints of discrimination/harassment.

73. I felt that in reporting to Anderson and to Gibbs, orally, that I was being subjected to racial harassment, discrimination and retaliation, that that should have been sufficient to prod the employer into investigating my complaints in open-minded and diligent fashion.

74. No one from the employer's Office of Affirmative Action or from its Office of Human Resources ever contacted me to learn the specifics of my complaint of discrimination, harassment, etc.

75. I was not given an Exit Interview or Exit Survey, in connection with the termination, even though the Employee Handbook provides for same.

75. The Bank is a federal contractor and a fund depository. 41 CFR S.60-1.3

75. The Bank is required by the provisions of 41 C.F.R. S.60-2.17(d) to develop auditing systems which periodically measure the effectiveness of their Affirmative Action Plans.

76. Gibbs and Anderson, have acted in violation of the provisions of the Bank's Policy on EEO and of the provisions of 41 CFR S.60.

77. I believe that it was Anderson, with the approval and/or knowledge of Gibbs, who ordered my termination, because she was fearful that I would obtain documentary proof, in the form of teller tapes, of her discriminatory actions

against me.

78. The termination has prevented me from checking the teller tapes because I do not have access to those documents.

79. In its Initial Disclosure, the Bank has not indicated that these Teller Tapes exist, far less, informed me as to their location.

80. Even if Gibbs were not informed, before the fact, that I was to be terminated, nonetheless, I did advise him of the racially and discriminatory implications of the termination.

81. Gibbs has given no indication to me that he conducted a reasonable investigation into my allegations.

82. Gibbs had and has the power to override the discriminatory and retaliatory decision to terminate me, implemented, ostensibly by defendant Anderson.

83. Gibbs has not done so.

84. I conclude that he has omitted to do so because Anderson and Gibbs have had a meeting of the minds that my termination should be attributed to my alleged deficiencies inperformance and that my charges of racial discrimination, harassment and retaliation, as the basis for the termination, would be resisted with vigour.

Jacqueline Lassiter

Signed under penalties of perjury.

Dated: _15_ th.December, '04

# GIBBS, BRIAN

| | |
|---|---|
| **From:** | jpreacherwomb [jpreacherwomb@netzero.net] [jpreacherwomb@netzero.net] |
| **Sent:** | Wednesday, May 22, 2002 2:38 PM |
| **To:** | Brian_Gibbs@fleet.com |
| **Cc:** | Kevin_Dolan@fleet.com |
| **Subject:** | Kimber |

Mr. Gibbs, perhaps, by now you've heard of Kimber's decision to terminate me, because I did not speak to a manager, when I called in Saturday, May 18, 2002. To my knowledge and the practice of the staff at Exeter, we were not informed that we must speak to a manager when informing of not coming in. On Tuesday when I returned, I was on time according to my watch. I always document my time according to that. We do not have a set time piece for documenting our time. I was not given a written notice, nor were there anyone to witness said action. Let it be known I did not resign. I await your response to this letter. Kimber's hostility towards me stems from me wanting to have understanding of a difference that I dispute. Please contact me at 617-282-7523 or the above e-mail address.

Jacqueline Lassiter

Exhibit A

7/22/2004

 **FleetBoston Financial**

## FleetBoston Financial
### Affirmative Action Policy Statement

At FleetBoston Financial, our continued success depends upon the collective strengths of our employees. That's why we're committed to offering all employees a variety of opportunities that foster professional and personal growth. We are also dedicated to supporting diversity—within our workforce, our customer base, and among our shareholders.

It is the policy of FleetBoston Financial to promote a positive program of Affirmative Action designed to ensure equal employment opportunity to all, without regard to race, color, religion, age, gender, national origin, sexual orientation, veteran status, or disability. This policy applies to every aspect of working at Fleet— including recruitment, hiring, placement, promotion, compensation, benefits, education, transfers, training, job elimination, and termination—and ensures that all employment decisions are based only on valid job requirements. We believe this policy is far more than just a legal requirement; it's also a sound business strategy.

### Responsibility for Implementing the Policy
All Fleet managers and supervisors are responsible for enforcing the principles of Equal Employment Opportunity (EEO) and Affirmative Action (AA) in their departments. These principles should also apply to any relationships we establish with customers, vendors, and others with whom we do business.

Managers and supervisors are expected to maintain positive and productive work environments, free of harassment or discrimination. Fleet will not tolerate any type of harassment or discrimination directed toward an employee, a job applicant, or a visiting third party on the basis of race, color, religion, age, gender, national origin, sexual orientation, veteran status, or disability. Fleet will fully investigate all employee harassment and discrimination complaints and will appropriately address any policy violations.

Neither employees nor job applicants will be subjected to harassment, intimidation, threats, coercion, or discrimination because they have either filed a complaint; assisted or participated in an investigation, compliance review, hearing, or other related activity; opposed any unlawful act or practice; or exercised any other right related to EEO or AA laws.

### Establishing Goals, Measuring Results
While supporting diversity and creating an inclusive work environment is everyone's responsibility, Corporate Human Resources Compliance Officer Sheila Tenney oversees Fleet's day-to-day adherence to AA policies. Fleet's AA coordinators help by implementing individual AA plans, as well as establishing goals and tracking our success. Human Resources directors and business-line managers monitor the overall program.

### Getting Additional Information
Employees can review information on Fleet's EEO and AA policies at their local Human Resources office during regular business hours. Employees with questions or issues related to Affirmative Action should speak with their manager, an Employee Relations Representative, Sheila Tenney, or Fleet's Office of Diversity.

Terry Murray
Chairman and Chief Executive Officer

Chad Gifford
President and Chief Operating Officer

January 2001

Exhbit C



# Fleet

## Employee Information Handbook





Working at Fleet

# WORKING AT FLEET

EMPLOYEE INFORMATION HANDBOOK

LAS - 0051

Preface by Anne Szostak . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi

INTRODUCTION
About the Employee Information Handbook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
Equal Employment Opportunity Policy/Affirmative Action . . . . . . . . . . . . . . . . . . .2
Diversity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
Freedom from Harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

I. EMPLOYMENT CATEGORIES AND WORK SCHEDULES
Employment Categories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
Flexible Work Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
Time and Attendance Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

II. REWARDS, RECOGNITION, AND BENEFITS SERVICES
An Overview of Your Employee Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

III. COMPENSATION
Base Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
Bonus and Incentive Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
Payroll Processing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
Wage Assignments and Garnishments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

IV. EMPLOYEE BANKING SERVICES
Banking Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
Direct Deposit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

V. HEALTH & WELLBEING
Consolidated Omnibus Budget Reconciliation Act (COBRA) . . . . . . . . . . . . . . . . .15
Dental Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Disability Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Flexible Spending Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Legal Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Life Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Long-Term Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Medical Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
Personal Accident Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
Vision Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

LAS - 0052

iv   Table of Contents

VI.  PAID TIME OFF
Bereavement Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
Extended Disability Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
Family and Medical Leave (FMLA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
Holiday Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
Jury Duty/Court Appearances on Behalf of the Company . . . . . . . . . . . . . . . . . .23
Military Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
Personal Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
Personal Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
Short-Term Disability Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
Sick Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26
Vacation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
Workers' Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

VII.  WEALTH PLANNER
Employee Stock Purchase Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
401(k) Savings Plus Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
Pension Plan/Cash Balance Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

VIII.  WORKLIFE
Adoption Aid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
Childcare — Bright Horizons and Stormy Day and Vacation Camp Programs . . . . . . . . .31
Employee Assistance Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
Flexible Work Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
Maternity Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
Paternity Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
Resource and Referral Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
Time Off for School Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
Tuition Reimbursement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
Volunteer Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
Wellness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

IX.  EMPLOYMENT
Background Checks and Fingerprinting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
Employee Referral Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
Employment of Relatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
Inspection of an Employee File . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
Outside Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
Re-Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
Temporary Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

X.  PERFORMANCE MANAGEMENT
Career Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
Job Posting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
Performance Management and Development . . . . . . . . . . . . . . . . . . . . . . . . . . .42

LAS - 0053

## XI. WORKPLACE EXPECTATIONS

Attendance and Punctuality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
Constructive Action Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
Drugs and Alcohol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45
Employee Issue Resolution Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46
Inquiries Regarding Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47
Ombudsman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47
Professional Appearance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47
Safety on the Job . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
Smoking Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
Solicitation for Donations, Material Sales and Distribution of Literature . . . . . . . . . . . .49
Use of Company Systems/Resources and Information . . . . . . . . . . . . . . . . . . . . . . .50
Work Hours/Meal Breaks/Short Breaks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52
Workplace Violence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

## XII. LEAVING FLEET

Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53
Exit Interview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53
Resignation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53
Severance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53
Unemployment Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

LAS - 0054

vi

## PREFACE

Welcome to FleetBoston Financial, one of the nation's premier financial services companies. Our company's culture reflects a progressive, entrepreneurial spirit and is best described using five key words—innovative, dynamic, accessible, expert, and forward-focused. It's an exciting time to be a member of the Fleet organization, and I hope you will find working with us to be a very positive, rewarding experience.

As a Fleet employee, you're part of a winning team of professionals that enjoys an integrated lifestyle. Our employees work hard, but they are also encouraged to spend quality time with their loved ones and get involved in their communities. You'll find that Fleet offers a supportive, family-friendly work environment, award-winning programs, and resources to help you accomplish your goals.

The attached employee handbook, titled *Working At Fleet*, contains more details about Fleet, our company's policies, and approved workplace standards. Please become familiar with this information. Further detailed information on these policies will become available via intranet and paper copy as we continue to build the Fleet organization. These policies are intended for domestic Fleet employees only; employees outside the U.S. should refer to their local Human Resources manuals. Please remember that this booklet is a reference tool and is not a substitute for communication with your manager. If you have further questions regarding these and other policies, please call HR On Call at 1–888–737–7661.

Once again, I'm happy that you're part of Fleet and want to extend my best wishes for your success.


Anne Szostak
EVP & Director, Corporate Human Resources

LAS - 0055

# ABOUT THE EMPLOYEE INFORMATION HANDBOOK

*This handbook...*

- Contains detailed information about HR policies and practices at Fleet and should be used only as an internal reference tool.
- Should be used in addition to clear and open communication between employees and their managers.
- Although comprehensive, *Working At Fleet* does not address every issue or question that may arise during an employee's tenure.

We encourage employees to bring to the attention of management suggestions or comments to improve our policies and programs, workplace conditions, or anything relating to making Fleet a great place to work.

If you have any questions, we encourage you to speak to your manager or HR representative, or call HR On Call at 1–888–737–7661.

*This handbook does not create any expressed or implied contractual or other legal obligations for the company or its employees, either expressed or implied, and does not alter the at-will nature of an individual's employment with the company or in any way create a promise of continued employment with the company. Fleet can modify or eliminate any policy or its related practices or procedures at any time with or without notifying employees. In the event of a conflict between the policies outlined in this handbook and the individual policy documents, the individual detailed policy documents shall govern.*

LAS - 0056

2  Introduction

# EQUAL EMPLOYMENT OPPORTUNITY POLICY/AFFIRMATIVE ACTION

At Fleet, we recognize that our continued success as a financial enterprise depends largely on the collective strengths of our diverse and talented workforce. Developing the right mix of skills, ideas and individuals requires an unwavering commitment to Equal Employment Opportunity (EEO) and Affirmative Action (AA). Accordingly, it is our policy to recruit, hire, train and promote persons in all job titles, and ensure that all other personnel actions are administered without regard to an employee's:

- Age
- Citizenship
- Color
- Disability
- Gender
- Marital Status
- National Origin
- Race
- Religion
- Sexual Orientation
- Veteran Status

Our commitment to the principles of Equal Employment Opportunity and Affirmative Action is reflected in all of our policies and procedures — from recruitment and hiring to training, compensation, benefits, transfers, and promotions. This commitment is based on sound management and business practices, as well as legal requirements.

In the spirit of fairness and EEO compliance, we will maintain a positive and productive work environment that calls for the highest standards of personal conduct. In keeping with these standards, any type of harassment or discrimination directed toward another employee or applicant on the basis of age, citizenship, color, disability, gender, marital status, national origin, race, religion, sexual orientation, or veteran status will not be tolerated. Further, employees and applicants shall not be subjected to harassment, intimidation, threats, coercion or discrimination because they have engaged in, or may engage in, filing a complaint, assisting or participating in an investigation, compliance review, hearing, or other related activities; opposing any unlawful act or practice; or exercising any other right related to EEO or AA laws.

As a company, we are committed to furthering the objectives of Equal Employment Opportunity and Affirmative Action. We expect each manager and employee to be an active partner in this effort by supporting, in word and deed, the spirit and principles of EEO and Affirmative Action. Further, we expect that these values will govern the relationships we establish with customers, vendors, and others with whom we do business.

# DIVERSITY

We believe diversity—the willingness and ability to embrace differences in our ideas, backgrounds and heritage, family dynamics, and other factors—is the key to our company's success. In our increasingly multi-cultural markets, appreciating diversity is a business imperative. Fleet therefore seeks to draw upon the full talents of every member of our workforce.

LAS - 0057

Diversity Resource Groups are typically employee-initiated and self-managed groups of individuals who come together on the basis of a shared commonality (disability, gender, race, sexual orientation, etc.). The groups' purposes include effecting positive change within Fleet and in the community at large, supporting one another, networking, and promoting the sense of understanding among our employees as well as throughout the organization.

Fleet-sponsored Diversity Resource Groups include:

- African-Americans
- Asians
- Employees with Disabilities
- Gays, Lesbians, Bisexuals and Transgendered
- Latinos
- Parents
- Women

Fleet supports the Diversity Resource Groups' efforts with annual budgets of $10,000 to spend at their discretion, plus grantmaking authority up to $25,000 for donations to the charities of the groups' choice that meet the four priority areas: youth development; public education; arts and culture; and economic opportunity. Information concerning the company's Diversity Resource Groups is listed on e-mail, flyers and other employee communications. Employees should feel free to reach out to the key contacts listed in those communications to learn more about meeting times and activities. Employees interested in learning more about starting a group may contact the Corporate Diversity Director at 617–434–8100.

## FREEDOM FROM HARASSMENT

The company maintains a positive and productive work environment that calls for the highest standard of personal conduct. In keeping with this standard, any type of harassment or discrimination directed toward another employee or applicant on the basis of age, citizenship, color, disability, gender, marital status, national origin, race, religion, sexual orientation, or veteran status will not be tolerated.

Fleet's zero tolerance policy applies to all aspects of an employee's experience including, but not limited to: hiring, benefits, compensation, training, promotions, transfers and customer/vendor relationships. Every employee has a role to play in making the company the best place to work and a place where people of many different backgrounds are encouraged and motivated to make an important contribution. The company recognizes that treating people fairly and decently has a direct impact on the organization's success.

Any type of harassment or discrimination on the basis of age, citizenship, color, disability, gender, marital status, national origin, race, religion, sexual orientation, or veteran status is strictly prohibited. Any offensive conduct that interferes with an employee's working conditions or job performance or creates a hostile or intimidating work environment, whether it is during or outside of "normal" working hours, is considered

LAS - 0058

4  Introduction

harassment. Such conduct can be verbal or physical in nature, but is not limited to: spoken statements, written statements, drawings, and graphic images. One example would be verbal comments about an employee's physical attributes.

Harassment and discrimination are violations of law as well as company policy. The company takes all allegations of harassment or discrimination seriously. In situations where harassment or discrimination has occurred, the company will act to eliminate the conduct and impose any necessary corrective or disciplinary action, up to and including termination of employment.

Any individual who raises a concern related to harassment or discrimination:

- is entitled to have this issue addressed by management in a prompt and responsible manner
- may do so without reprisal, criticism, or negative consequences
- can expect that the investigation of such concerns will be handled fairly, objectively, and with the appropriate level of confidentiality and discretion
- will have his or her rights respected
- can expect that the rights of those who have been accused of harassment or discrimination will also be respected.

All behavior is evaluated based upon the totality of the circumstances, including the severity of the conduct and how pervasive it is.

L A S - 0 0 5 9

# Leaving Fleet

## BENEFITS

Please refer to the Consolidated Omnibus Budget Reconciliation Act (COBRA) section under the Benefits/Health & Wellbeing section.

## EXIT INTERVIEW

Just as Fleet interviews an employee before he or she is hired, Human Resources also interviews employees as they resign. These discussions are called exit interviews and they offer valuable insight into the *Working At Fleet* experience. Exit interviews also help the company to improve its policies, procedures, and overall work environment. Interviews may be conducted in person or by telephone. During an interview, employees are asked to complete a questionnaire about working at Fleet. Questionnaires can be mailed to former employees' homes if necessary.

## RESIGNATION

At Fleet, our hope is that employees will remain part of our team and develop long, successful careers here. Employment with the company has no specific term or length, unless there is an enforceable written employment contract that contains such terms. If an employee feels the need to resign, he or she may do so at any time for any reason.

Employees who voluntarily resign from the company should submit a letter of resignation to their immediate supervisor or manager. The letter should include the following information:

- The effective date of employee's resignation
- The specific reason for leaving
- Name of the employee's assigned department
- Employee's legal signature

Human Resources will help outgoing employees and their managers throughout the transition period. Human Resources will also mail any paperwork concerning the outgoing employee's health and welfare benefits directly to his or her home address.

## SEVERANCE

Fleet has established a Severance Pay and Benefits Plan to assist eligible employees who lose their positions with the company under certain circumstances.

Questions regarding the Severance Pay and Benefits Plan should be referred to HR On Call at 1–888–737–7661.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JACQUELINE LASSITER,

       Plaintiff,

v.                                 CA No. 04-10550-WGY

KIMBER ANDERSON, ET AL.,

       Defendants.

## DEFENDANTS' ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT FLEET BANK

       Pursuant to the Federal Rules of Civil Procedure, Defendant Fleet National Bank, incorrectly identified by Plaintiff as "Fleet Bank" ("Fleet" or "Defendants "), submits the following answers and objections to Plaintiff's First Set of Interrogatories propounded to Defendant:

### General Objections

       Fleet makes the following General Objections (the "General Objections") to Plaintiff's interrogatories. Fleet incorporates by reference these General Objections into Fleet's responses to each individual interrogatory, to the extent applicable, whether or not specifically stated in any individual response.

       1.    Fleet objects to these interrogatories or any specific interrogatory to the extent that they seek information that is not relevant to the issues raised in this action and that is not reasonably calculated to lead to the discovery of admissible evidence, or that they require Fleet to exceed its obligations under the Federal Rules of Civil Procedure.

       2.    Fleet objects to any interrogatory to the extent that it seeks discovery of privileged information or non-discoverable attorney work product pursuant to Fed. R. Civ. P. 26(b)(3).

3.    Fleet objects to these interrogatories to the extent that they seek information that is already in the possession of Plaintiff, or is more readily available to Plaintiff.

4.    Fleet objects generally to any and all interrogatories to the extent they seek information concerning the substance of each and every communication concerning general subject matters, dates of such communications and/or the names of all participants to such communications, on grounds that such interrogatories are overly broad and unduly burdensome taking into account the needs of this case and that the information sought by way of these interrogatories can be obtained more easily through other means of discovery. Without waiving this objection, Fleet will answer these interrogatories generally to the extent that its representatives currently can recollect such communications and to the extent the interrogatories seek information reasonably calculated to lead to the discovery of admissible evidence.

5.    Fleet objects to these interrogatories to the extent that they seek information that is commercially confidential, proprietary in nature, constitutes trade secrets, or which is protected by the confidentiality and privacy rights of others.

6.    Fleet objects to these interrogatories to the extent a full and complete response would subject Fleet to undue burden and expense.

7.    Fleet objects to these interrogatories to the extent the general provisions, instructions and definitions set out in the interrogatories exceed the scope of, or impose burdens not required by, the Federal Rules of Civil Procedure.

8.    Answers to Plaintiff's interrogatories are qualified by the objections, whether general or specific, asserted herein. Answers to interrogatories do not waive any objections asserted.

PRV_665082_1/AFURNESS

Without waiving these objections, and without admitting the relevance or materiality of any of the information Plaintiff seeks through the interrogatories, Fleet responds to the interrogatories as follows:

## ANSWERS TO INTERROGATORIES

1.    State the true and correct name of the entity which was the employer of the plaintiff at Exeter Plaza, Boylston Street, Boston, MA in 2001-'02 and state the address of its business headquarters in Massachusetts.

### ANSWER:

**Fleet National Bank employed Plaintiff in 2001-2002.    Fleet National Bank's headquarters are located at 100 Federal Street, Boston, Massachusetts, 02110.**

2.    State the name, job title, race, duties and date of appointment to current position, of the person who is supplying answers to these interrogatories on behalf of the defendant Fleet Bank (hereinafter referred to as "the Bank" or as "Fleet" or as "the employer").

### ANSWER:

**Brian Gibbs, Banking Center Manager.  Mr. Gibbs is Caucasian and has been a Banking Center Manager since 1999.  As Banking Center Manager, Mr. Gibbs is responsible for the operations, sales, and service activities of the entire banking center.**

3.    Describe every instance of protest, complaint or opposition by the plaintiff, on account of any alleged unfair treatment, racial discrimination, racial harassment and/or retaliation, including but not limited to the date(s) of same; the name and job title of the person to whom the protest, complaint, was made, the form of the protest (i.e., whether oral, in writing, etc.) and the name, job title and race of every person present.

**ANSWER:**

Fleet objects to this Interrogatory on the grounds that "unfair treatment" is vague, ambiguous, and fails to specify information or categories of information with reasonable particularity. Subject to and without waiving the foregoing objections, Fleet states as follows: During her employment at Fleet, Plaintiff never advised anyone that she felt that she was subjected to racial discrimination or racial harassment.

4. For every one of the past ten years, set forth the name, race, sex, address and job title who [sic] protested against alleged unfair treatment, harassment, discrimination and/or retaliation; provide a summary of every such complaint including the date and the name and job title of the person (s) to whom the complaint/protest was made.

**ANSWER:**

Fleet objects to this Interrogatory on the grounds the terms "protested against" and "unfair treatment" are vague and ambiguous. Fleet further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, not reasonably limited in time or scope, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information of a personal or private nature pertaining to current or former Fleet employees. Fleet further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

5. With regard to your answer to #4, supra, describe any and all investigations conducted by the Bank into such complaints, including the name, job title and race of the persons who conducted the investigations, the dates and the findings of same.

**ANSWER:**

Fleet objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, not reasonably limited in time or scope, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information of a personal or private nature pertaining to current or former Fleet employees. Fleet further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Fleet further objects to this Interrogatory on the grounds that the terms "protested against" and "unfair treatment" in Interrogatory No. 4 are vague and ambiguous.

PRV_665082_1/AFURNESS

6.    Describe in detail, every document on which the Bank relied, in making the decision to terminate plaintiff, giving the name, date and author of such documents.

**ANSWER:**

**Fleet objects to this Interrogatory on the grounds that it did not "rely" on any document or set of documents in making the decision to terminate Plaintiff. Subject to and without waiving the foregoing objection, Fleet states as follows: Fleet considered Plaintiff's 90-Day Formal Counsel warning of March 12, 2002 from Kimber Anderson (which Fleet will produce in response to Request No. 11 of Plaintiff's First Request for Production of Documents) and the Attendance/Punctuality policy from the Fleet Branch Procedure Manual (which Fleet will produce in response to Request No. 5 of Plaintiff's First Request for Production of Documents).**

7.    Describe in detail, any investigation conducted by the Bank, prior to the date of the termination of the plaintiff, into any of the plaintiff's protests, complaints or statements of opposition to and/or protest against racial discrimination, harassment and/or retaliation; setting forth the name, race and job title of every person who participated in any such investigation and a summary of the findings of same.

**ANSWER:**

**Fleet objects to this Interrogatory on the grounds that the phrase "protests, complaints, or statements of opposition" is vague and ambiguous. Fleet further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Subject to and without waiving the foregoing objections, Fleet states as follows: During her employment at Fleet, Plaintiff never advised anyone that she felt that she suffered racial discrimination or racial harassment.**

8.    Describe any alternatives to the termination of the plaintiff, which were considered by the Bank; set forth the cost to the Bank, in U.S. currency of the implementation of such alternatives; the reasons why the Bank declined to take follow such alternatives and give

the name, race, job title and address of the persons who considered and rejected such alternatives.

**ANSWER:**

**Fleet objects to this Interrogatory on the grounds that it calls for speculation. Fleet further objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine.**

9.    Set forth all facts which tend to show that the plaintiff has unreasonably failed to mitigate her damages.

**ANSWER:**

**Fleet objects to this Interrogatory on the grounds that it seeks information already in the possession of, or reasonably accessible to Plaintiff. Fleet further objects to this Interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other privilege in that it seeks information which has been acquired or prepared in anticipation of litigation or for trial, or relating to the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of Fleet concerning this litigation. Fleet reserves the right to supplement its response to this Interrogatory as discovery is ongoing.**

10.    Set forth the name, address, race and job description of the person(s) who served in the capacity of Affirmative Action Officer of the Bank in the period 1993-2002; giving the qualifications of said person(s) for the position and date of appointment.

**ANSWER:**

**Fleet objects to this Interrogatory on the grounds that it is overly broad, not reasonably limited in time, and not reasonably calculated to lead to the discovery of admissible evidence.**

11.    Set forth the name, address and area of expertise of every expert witness on whom the Bank expects to rely at the trial of this action; the expected expert opinions and the factual bases for every such expert opinion.

- 6 -

**ANSWER:**

Fleet states that it has not yet selected the expert(s), if any, it intends to call at the time of trial. Fleet reserves the right to supplement this answer.

12.    Describe every contract into which the Bank has entered either with the government of the United States or (sic) with any state government or local government body; giving the monetary value, in U.S. currency of every such contract, the effective dates and a summary of serves which the Bank agreed to provide.

**ANSWER:**

Fleet objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, not reasonably limited in time or scope, and not reasonably calculated to lead to the discovery of admissible evidence.

13.    State the dates(s) on which the Bank first employed Brian Gibbs and Kimber Anderson; their beginning salaries; current salary or last salary of each individual; employment history and business and residential address.

**ANSWER:**

Fleet objects to this Interrogatory on the grounds that the term "employment history" is vague and ambiguous. Fleet further objects to this Interrogatory on the grounds that it seeks information of a personal and private nature pertaining to current or former Bank employees, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objection, Fleet refers to and incorporates its Initial Disclosures Pursuant to F.R.C.P. 26(a), which states Mr. Gibbs' and Ms. Anderson's addresses. Further answering, Fleet states that Brian Gibbs commenced his employment at Fleet on or around November 12, 1996, and Kimber Anderson commenced her employment at Fleet originally on or around June 29, 1987 and most recently on or around December 17, 2001.

14.    Set forth in detail any explanation provided to the Bank by its insurer(s) for refusal or denial of insurance coverage for any judgment (or any part thereof) which may be entered in favor (sic) of the plaintiff in this action; providing the date on which the defendant

- 7 -

made inquiry as to whether the insurer(s) would provide coverage herein and giving the name, address of the person who provided the explanation (on behalf of the insurer(s)) and the date thereof.

**ANSWER:**

**Fleet objects to this Interrogatory on the grounds that it calls for speculation and is vague, ambiguous, overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Fleet further objects to this Interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other privilege in that it seeks information which has been acquired or prepared in anticipation of litigation or for trial, or relating to the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of Fleet concerning this litigation.**

FLEET NATIONAL BANK
By its attorneys,

Dated: July 2⅔, 2004

_Melanie L. Glickson_
George P. Kostakos (BBO# 557919)
Melanie L. Glickson (BBO #652565)
2800 Financial Plaza
Providence, RI 02903
(401) 528-5864
(401) 528-5859 (fax)

101 Federal Street
Boston, MA 02210
(617) 439-4444
(617) 439-4170 (fax)

PRV_665082_1/AFURNESS

## VERIFICATION

I hereby certify that I have reviewed the above Interrogatories and responses thereto and

tha they are true and accurate to the best of my knowledge and belief.

Brian Gibbs

Sul scribed and sworn to before me on this 23 day of July 2004.

Notary Public
My Commission Expires:

**HEATHER A. CELIDONIO**
Notary Public
Commonwealth of Massachusetts
My Commission Expires
April 7 2011

- 9 -

PRV_PRV_665082_1.DOC/AFURNESS

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of July 2004, I caused a copy of the foregoing Defendants' Answers and Objections to Plaintiff's First Set of Interrogatories to be mailed via first-class mail, postage prepaid, to:

Winston Kendall, Esq.
Law Office of Winston Kendall
136 Warren Street
Roxbury, MA  02119

Melanie L. Glickson

- 10 -