UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A.#04-10550-WGY

JACQUELINE LASSITER

v.

KIMBER ANDERSON ET AL.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

FACTS:

Jacqueline Lassiter, the plaintiff, is a female African American citizen of the United States and a resident of Suffolk County, Massachusetts.

The employer, Fleet Bank, hereinafter ("Fleet") distributed an Employee Handbook, which contained a section labelled EQUAL EMPLOYMENT OPPORTUNITY/AFFIRMATIVE ACTION in which it pledged its commitment to furthering the objectives of equal employment opportunity and affirmative action. The Bank, in the Handbook, asserted that it expected its Managers and employees to be active partners in the effort to support, in word and deed, the spirit and principles of equal employment opportunity and affirmative action.

The representations made by the Bank with regard to its adherence to equal employment opportunity and affirmative action in its employment practices and selection policies, as described in the Handbook, were sufficient to form the terms of a contract between the Bank and plaintiff.

In entering into employment with Fleet, as a Teller, on or about $10^{th. October}$, '01, at the Exeter Plaza Branch, and in remaining in that employment, plaintiff relied on the Bank's representations with regard to equal employment opportunity. Plaintiff was seeking long term employment and promotional opportunities.

The Employee Handbook advertised a Flexible Work Policy by which an employee could work staggered hours.

Consistent with the representation in the Handbook, plaintiff informed her

supervisors, including defendant Brian Gibbs, a white male, that she wanted to work according to a flexible schedule and that she did not wish to work on Saturdays. Plaintiff also told Gibbs that she was aware that an exception had been made, for another employee, relative to the Saturday work requirement.

White employees of the Exeter Plaza Branch ("Branch") were able to use the flexible work schedule.

Gibbs, even though he had the authority to approve plaintiff's request for a flexible schedule, discriminatorily denied plaintiff's request.

Because of the exemplary performance of her duties, Plaintiff was selected to participate in a Focus Group, convened at the Federal Street Headquarters of Fleet, at an early stage of her employment. One of the primary purposes of the Focus Group, was to have Tellers, such as Plaintiff, discuss issues and problems which they confronted in the performance of their duties and to allow them to better perform.

Tellers were assured, in conjunction with their participation in Focus Group activities, that there would be confidentiality with regard to the proceedings at the sessions and that they could speak their minds freely, without anxiety that their statements would be reported back to the Branches where they worked.

On the very next day, following plaintiff's participation in the Focus Group and upon her return to the Branch, defendant Gibbs summoned plaintiff into his office and, in a harsh tone of voice, scolded her with the statement " .. whatever happens in Exeter, stays in Exeter"..Gibbs refused to explain what he meant when plaintiff queried him. He told her further that " .. You know exactly what I mean .."

Plaintiff interpreted the reprimand to mean that Gibbs was offended by some things she was reported to have said at the Focus Group session and that Gibbs felt that her remarks had put him in a bad light with other officials at Fleet.

Plaintiff concluded, that Gibbs would not be non-discriminatory in his

treatment of her work.

At some time in March or April, '02, Gibbs summoned plaintiff into his office. When plaintiff entered, she saw defendant Kimber Anderson, a white female and her supervisor, in the office.

Gibbs told plaintiff that "we want you to connect to the Tellers" and that "the Tellers feel that you are not connected". Gibbs refused to explain, when queried by plaintiff, what he meant.

Defendant Anderson joined in by saying that "we want you to assume a leadership role so that you can help the Tellers".

Plaintiff interpreted the enigmatic remarks and instructions, in the overall context of Gibbs' reprimand of her apparent criticism of supervisory practices and procedures of the Branch, while participating in the Focus Group, to be part of an effort of both supervisors to deliberately attempt to confuse her so that she would not know how to carry out their orders and provide the occasion for a charge that she had refused to obey their orders and that she had improperly carried out her duties. Plaintiff was also aware of an undercurrent, in this meeting, that these white supervisors, had taken offense, because, she, an African American, had the temerity to expose to persons at Headquarters, supervisory shortcomings at the Branch. Her experience, as an African American, was that white persons in positions of authority, do not accept with equanimity, criticisms or critique of their performance by subordinate African Americans.

The impressions which plaintiff derived from this meeting, as to the motivation of Gibbs and Anderson, were reinforced on the following day when they again summoned her to Gibbs' office, where they repeated their instruction that plaintiff "connect" with the Tellers. They again refused to elaborate on what they meant, upon being asked to do so, by the plaintiff.

In April, '02, Anderson gave plaintiff a written warning in which she criticized her attendance, punctuality and teller differences.

Plaintiff told Anderson that she would not sign the document because she

disagreed with its contents. Plaintiff explained to Anderson that the times were wrong and that she had to examine her Time Sheets.

Anderson told plaintiff that she thought that Tellers and Sales Representatives had to report at the same time; 9:30 a.m. However, Anderson was mistaken, as Tellers were required to report fifteen minutes after Sales Representatives.

When plaintiff informed Anderson of the different times for reporting, Anderson said that she would correct the notations on the document.

Approximately one week after the above described meeting, plaintiff was summoned to Gibbs' office, where Anderson was present. Gibbs handed plaintiff a Warning, in which the supervisors criticized her attendance, punctuality and Teller differences.

Upon examining the document, plaintiff realized that the errors relative to her time for reporting to work, had not been corrected by defendant Anderson, as she had indicated she would.

Plaintiff felt so frustrated and fed up with the harassment by Gibbs and Anderson and realizing the futility of any protest, signed the document and left the office.

The allegation of excessive Teller differences came as a surprise to the plaintiff, who, at the end of the day, would check her records and attempt to reconcile. Her differences, as she remembered, were within the officially accepted limit.

Plaintiff did not believe that Gibbs and Anderson would be fair and felt that Anderson would not assist her in her attempts to show that she was not responsible for the sum of Teller differences charged to her. On more than one occasion, when plaintiff tried to inspect the Teller tapes, which were stored in the back room of the Branch, Anderson would tell her that she could not look at them and that the Courier was on his way to collect them. Plaintiff was thereby deprived of the opportunity to check the alleged Teller differences against the

Teller tapes.

Plaintiff would occasionally work at the Copley Branch, where there was a black supervisor, Anne LNU. Plaintiff asked Anne what she could do if she felt that her supervisors were unfairly charging her with Teller differences.

Anne told plaintiff that she should speak to a woman named "Pam", who plaintiff believed to be a Pamela Menaud. Anne provided a telephone number.

Plaintiff telephoned Pam and explained the reasons for the call. Plaintiff provided her Teller identification number. Pam told plaintiff that defendant Anderson, had told her to apply the Teller differences of Nelson Velez (a white male individual who worked at Exeter) to plaintiff. Pam also told plaintiff to check the Teller tapes when she returned to the Branch.

When plaintiff did return to Exeter, she made attempts to leave the Window to go to the back room to check the Teller tapes.

Defendant Anderson approached plaintiff, raising her voice and said " .. get back to your station .. ..I don't pay you to be in here .. You are on my time now ".

When plaintiff told Anderson that she was trying to find the Teller tapes, Anderson told her " .. do that on your own time".

Plaintiff told Anderson that she did not want her to know the truth and that it was discrimination.

The Bank never provided plaintiff with a writing, around the time of the involuntary separation, of the official reasons therefor.

After her termination, plaintiff sent a writing to Gibbs, in which she explained that she did telephone the Branch, on the morning on which she did not report to work, and did tell the person who answered the telephone, that, in fact, she would not report to work. She also explained in this writing that that was the practice at Exeter.

Plaintiff did telephone Gibbs at the Branch, after the termination, and recounted to him the series of incidents with Anderson and expressed the view

that Anderson was racially motivated in her acts of harassment.

Gibbs responded by saying that ".. he did not think so". He promised that he would get back to plaintiff.

Approximately two weeks later, Gibbs telephoned plaintiff at her home and expressed that he agreed with the termination.

Gibbs was aware, through the plaintiff's conversation with him, that Anderson had subjected plaintiff to racial discrimination, racial harassment and retaliation, because she had protested against Anderson's discriminatory actions.

There is not a single document in plaintiff's Personnel File, which shows that Fleet, Gibbs or Anderson, ever investigated plaintiff's charge that Anderson had subjected her to racial discrimination, harassment and retaliation.   In fact, the defendants, in their Answers to Plaintiff's Interrogatories, asserted that plaintiff never complained of racial harassment, etc.

There is no specification in the Employee Handbook that complaints of discrimination must be or should be, in writing.  In fact, the Bank never made plaintiff aware of any pre-printed Form, on which employees could register complaints of discrimination.

Plaintiff believed, that in orally reporting to defendants Gibbs and Anderson, that she was being subjected to racial harassment, that that should have been sufficient notice to prod the Bank into investigating her complaints in a diligent and open-minded fashion.

Gibbs and Anderson participated in the decision leading to the termination of the plaintiff, on or about $17^{th.May}$, '02, relying in part on plaintiff's alleged violation of the Bank's policy relative to Attendance and Punctuality and excessive Teller differences.

The Bank's Policy, in fact, permitted up to eight absences within a twelve month period and defendants charged plaintiff with five absences during a twelve month period.  Plaintiff, had not violated the Bank's Policy.

No one from the defendant's Office of Affirmative Action or Human

Resources ever contacted plaintiff to learn the specifics of her complaint of discrimination, harassment, etc. Plaintiff was not afforded an Exit Interview/Survey, in connection with the termination, even though the Handbook provides therefor.

The Bank is a federal contractor and a fund depository. The Bank is required by the provisions of 41 CFR S.60-2.17(d) to develop auditing systems which periodically measure the effectiveness of the Affirmative Action Plan. Under these regulations, contractors, such as the Bank, are required to perform in-depth analyses of their total employment process to determine whether and where there exist impediments to equal employment opportunity. Such contractors, at the very least, are required, inter alia, to evaluate and analyze: applicant flow, hires, terminations, promotions and other personnel actions to determine if there are selection disparities.

Gibbs and Anderson, acted in violation of the provisions of the said regulations in the disciplining and terminating plaintiff.

Plaintiff believed and continues to believe that Anderson, with the approval and/or knowledge of Gibbs, ordered plaintiff's termination in order to prevent her from obtaining documentary proof of Anderson's discriminatory actions and in retaliation for plaintiff's protest/opposition to racial harassment, etc.

Gibbs gave no indication to plaintiff that he conducted a reasonable investigation o f the claims of discriminatory termination and in fact, told plaintiff that the termination was justified.

Plaintiff concluded that there had been a meeting of the minds between Gibbs and Anderson with regard to the stated rationale for the termination and that they would resist, vigourously, plaintiff's charges of discrimination.

ISSUE:

HAVE THE DEFENDANTS PROVEN BY FACTS ADMISSIBLE AT TRIAL

THAT THERE IS NO DISPUTE AS TO ANY OF THE MATERIAL
FACTS AND THAT THEY ARE ENTITLED TO JUDGMENT
ARGUMENT:

THE UNCONTROVERTED FACTS SHOW THAT THE DEFENDANTS
HAVE FAILED TO MEET THEIR BURDEN

A plaintiff satisfies her burden of proof under S.1985 by establishing: That two or more persons entered into an unlawful agreement; that they did so knowingly and wilfully; that one of the members of the conspiracy, knowingly committed at least one overt act; in furtherance of some objective of the conspiracy. United States v. Jackson, 482 F.2d 1167 (10th.Cir.,1973); Smith v. Private Industry Council of Westmoreland & Fayette Counties, 622 F.Supp.160, 164 (W.D. Pa.,1985).

The facts, as shown by plaintiff's Affidavit and the Facts of the Verified Complaint show that the defendants Gibbs and Anderson subjected plaintiff to racial harassment in employment by doing the following: harassing her over remarks made at the Focus Group; denying her a flexible schedule; wrongfully reporting in her record that she had been tardy and refusing to correct same even when Anderson admitted that she had been wrong; discriminatorily charging a white employee's Teller differences to plaintiff; retaliating against plaintiff when she complained of this racially motivated charge- of Teller differences; terminating plaintiff even though she had not violated the Bank's policy on Attendance and tardiness.

THERE IS NO REQUIREMENT THAT THE DEFENDANTS
BE SHOWN TO HAVE MET TO HATCH THE CONSPIRACY

There is no legal requirement of a showing that the individual defendants have met in order to hatch the conspiracy and plan actions to be taken. It is sufficient if there is a showing that one of the conspirators had knowledge of the conduct of a subordinate and consented to it. See, Alvarez v. Wilson, 431 F.Supp.136, 146 (N.D.Ill.,1977).

The regulations of 41 CFR S.60-2.17(d) obligated the Bank and its supervisory officials to not only have an Affirmative Action Program but also to take effective measures to monitor its workings. None of the defendants informed plaintiff of her right to complain of discrimination. Neither did they investigate plaintiff's complaints, in violation of the regulations. As supervisory officials, they were aware of the Bank's commitment to Affirmative Action and were required to adhere to such policies. See. First Alabama Bank of Montgomery, N.A., v. Donovan, 692 F.2d 714 (1982).

The facts clearly show that Gibbs, even if he did not authorize the discriminatory actions of Anderson, was informed of same by plaintiff. He did not conduct a reasonable investigation into plaintiff's charges of discrimination and harassment and retaliation. In fact, he told plaintiff that he agreed with the termination. On this record therefore, it is clear that Gibbs ratified the acts of Anderson and that there was a meeting of the minds as to the discriminatory conduct.

Defendants have failed to show that there is no genuine issue as to any of the material facts, especially, the facts that: Gibbs knew of the discriminatory acts of Anderson; had the power to rectify the discriminatory wrongs, and, not only omitted to do so; but indicated that he agreed with them.

CONCLUSION:

For the foregoing reasons, plaintiff prays that the defendants' Motion For Partial Summary Judgment be denied.

                    Plaintiff,
                    By her Attorney,

                    _____
                    W.Kendall
                    136 Warren Street
                    Roxbury, Ma02119
                    (617) 442-6130

## CERTIFICATE OF SERVICE

I, W.Kendall, counsel for plaintiff, Jacqueline Lassiter, hereby certify that on 27th.December, '04, I made service of the foregoing Corrected Memorandum. first class mail, postage pre-paid on S.Sweeney, esq., Edwards, Angell, 101 Federal St., Boston, Ma.02110.

_____
W.Kendall

## CERTIFICATE OF SERVICE

    I, W.Kendall, counsel for plaintiff, hereby certify that on 27th.December, '04, I made service of copies of the foregoing Motion For Leave To File Corrected Copy of Memorandum In Support of Plaintiff's Opposition To Motion For Partial Summary Judgment; Corrected Memorandum; Affidavit; Motion For Leave To Amend Complaint, first class mail, postage pre-paid on S.Sweeney, esq., Edwards, Angell, 101 Federal Street, Boston, Ma.02110.

                                                                            W.Kendall