UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JACQUELINE LASSITER,<br><br>               Plaintiff,<br><br>v.<br><br>KIMBER ANDERSON, BRIAN GIBBS,<br>FLEET NATIONAL BANK<br><br>               Defendants. | Civil Action No. 04-cv-10550-WGY |

**DEFENDANTS' REQUEST FOR FINDINGS OF FACT AND RULINGS OF LAW**

Pursuant to Fed.R.Civ.P. 52, Defendants Fleet National Bank ("Fleet"), Brian Gibbs ("Gibbs") and Kimber Anderson ("Anderson") submit this request for finding of facts and rulings of law. Defendants reserve the right to amend and revise these requests in response the evidence and issues presented at trial.

**PROPOSED FINDINGS OF FACT**

**Facts as to Liability**

1. Plaintiff was terminated from her employment with Fleet on Tuesday, May 21, 2002, after she failed to report for work as scheduled on Saturday, May 18, 2002.

2. At the time of her absence on May 18, 2002, Plaintiff she was on a final written warning for three areas of performance deficiency, including tardiness and absenteeism.

3. Plaintiff began her employment as a full time Teller with Fleet on or around October 10, 2001.

4. Plaintiff's employment with Fleet was at-will employment. She could terminate her employment with Fleet at any time for any reason or no reason, and Fleet could terminate her employment at any time for any reason or no reason.

5. Plaintiff did not have a contract of employment with Fleet for any specific term.

6. At the time of her hire, Plaintiff underwent mandatory human resources orientation in which she received Fleet's employee policies, including its employee information handbook entitled <u>Working at Fleet</u>.  Ex. 6.

7. The policies provided to Plaintiff during her orientation included policies related to equal employment opportunity/affirmative action, diversity, freedom from harassment and employee issue resolution process and information about how to contact an employee relations representative with problems or concerns about her employment.  Ex. 6.

8. The policies provided to Plaintiff during her orientation also included policies related to personal time off, attendance and punctuality and holiday time.  Ex. 6.

9. Plaintiff underwent Teller training for several days or weeks, in which she received training concerning her duties and responsibilities as a Teller, including her responsibilities for accuracy in her work and the requirements of the Bank Secrecy Act with respect to certain transactions.

10. Plaintiff was hired to work at Fleet's Exeter Plaza branch as a full time Teller and she began her assignment that branch following her Teller training.

11. In January 2002, Plaintiff requested a part time schedule. Ex. 12.

12. Plaintiff's request for a part time schedule was approved, with some modifications to the hours and days of scheduled work.

13. Although Plaintiff did not receive the exact schedule she requested, Fleet and its branch manager, Gibbs, permitted Plaintiff to reduce her hours.

14. In general, when Plaintiff was employed by Fleet, part time Tellers of the Exeter Plaza branch were required to work on Saturday and full time Tellers worked Saturdays on a rotating schedule.

15. Plaintiff's performance, both as a full time employee and a part time employee, did not meeting Fleet's objective expectations in the areas of teller differences, Bank Secrecy Act compliance, and attendance and punctuality.

16. Plaintiff received written warnings or counsels for her performance in the area of teller differences and Bank Secrecy Act ("BSA") violations on March 12, 2002. Plaintiff acknowledge receipt of these warnings by signing the documents. Ex. 13 and Ex. 14.

17. On February 1, 2002, Fleet issued a notice to Plaintiff's branch that on January 25, 2002, Plaintiff conducted a transaction in the amount of $19,000.00, but failed to file the proper documentation under the Bank Secrecy Act. Ex. L

18. The BSA requires that financial institutions, including banks such as Fleet, file mandatory reports relating to cash transactions and transactions in excess of $10,000.

19. Sanctions for failure to comply with the BSA could include fines and other penalties against Fleet and its employees.

20. Prior to April 13, 2002, Gibbs gave Plaintiff permission to post or apply for the position of Training Specialist II.

21. Fleet had a policy that employees could not seek transfer within the company until they had at least 12 months of service, unless they received their manager's approval. Ex. 6.

22. With Gibb's approval, prior to being placed on a 90-day probation, Plaintiff posted for the Training Specialist II position. Ex. 21.

23. Plaintiff was interviewed for the Training Specialist II position, but did not receive an offer. Ex. 24.

24. On April 13, 2002, Plaintiff received a 90-day final counsel warning for her performance in the areas of teller differences, Bank Secrecy Act compliance violations and for excessive tardiness and absenteeism. Ex. 19.

25. Plaintiff acknowledged receipt of this final counsel warning by refusing to sign the document and submitting a written statement to Gibbs and Anderson to the effect that she would investigate the allegations and inform her managers of her position at a later date. Ex. 20.

26. Under the policy on attendance and punctuality in Fleet's employee information handbook:

> Absence or lateness affects our ability to provide internal and external customers with quality service. It's unfair to the others on the team who may have to take on more work to compensate for a colleague's inconsistency. For these reasons, Fleet expects employees to maintain regular and on-time attendance.
>
> If you must be late or absent from work, be sure to communicate clearly with your manager. *Employees who are absent three or more consecutive scheduled days and do not contact their manager may be considered to have voluntarily terminated employment.*
>
> While each business unit is responsible for establishing its own guidelines for excessive absenteeism or lateness, generally five or more separate incidents of absence during a 12-month period is considered excessive. Managers should speak to employees who develop a pattern of chronic absenteeism or lateness to try to alleviate the problem. Employees who develop such a pattern may be subject to disciplinary action, up to and including termination of employment.

Ex. 6, p. 43.

27. Pursuant to the Fleet branch procedure manual, the standards for absenteeism and punctuality, constructive action of informal counsel was appropriate after four (4) occurrences of absenteeism and/or tardiness, formal counsel/action plan was appropriate after six (6) occurrences of absenteeism and/or tardiness, written warning was appropriate after nine (9)

occurrences of absenteeism and/or tardiness, and ten (10) occurrences of absenteeism and/or tardiness was grounds for probable termination. Ex. 4, p. 2.

28. Pursuant to Fleet's policy on personal time off from work, after three consecutive months of service, full time employees could take 16 hours of personal time per calendar year. Part time employees received fewer personal time hours, pro rata based on their scheduled hours of work. Ex. 6, p. 24.

29. In November 2001, Plaintiff had net teller differences of $278.25 and had performed 6 individual transactions with differences, Ex. 1 and Ex. 2, in excess of the monthly standard of net differences less than $125.00 in net differences and not more than 4 individual transactions with differences, exclusive of phantom teller/adjustments or recoveries. Ex. 1 and Ex. 2.

30. In December 2001, Plaintiff had net teller differences of $348.49 and had performed 10 individual transactions with differences in excess of the monthly standard of net differences less than $125.00 in net differences and not more than 4 individual transactions with differences, exclusive of phantom teller/adjustments or recoveries. Ex. 1 and Ex. 2.

31. In January 2002, Plaintiff had net teller differences of $51.49 and had performed 5 individual transactions with differences in excess of the monthly standard not more than 4 individual transactions with differences, exclusive of phantom teller/adjustments or recoveries. Ex. 1 and Ex. 2.

32. In February 2002, Plaintiff had net teller differences of $285.07 and had performed 8 individual transactions with differences in excess of the monthly standard of net differences less than $125.00 in net differences and not more than 4 individual transactions with differences, exclusive of phantom teller/adjustments or recoveries. Ex. 1 and Ex. 2.

33. In March 2002, Plaintiff had net teller differences of $333.26 and had performed 4 individual transactions with differences in excess of the monthly standard of net differences less than $125.00 in net differences.   Ex. 1 and Ex. 2.

34. Exhibits 1 and 2 are true copies of O & S reports maintained by Fleet.  The O & S Reports do not list phantom teller/adjustments or recoveries, but include teller difference that are in excess of the phantom limit.

35. After placing Plaintiff on her 90-day final counsel warning, Defendants expected her performance to improve in all of the areas cited, namely, teller differences, Bank Secrecy Act compliance and that she would not be tardy for or absent from work on scheduled days of work. Ex. 19.

36. Plaintiff, while on her 90-day final counsel warning for tardiness and absenteeism, failed to report to work as scheduled on May 18, 2002.  Ex. 3.

37. On May 18, 2002, Anderson was the supervisor in charge of the Exeter Plaza branch.

38. On May 18, 2002, Gibbs was on a scheduled absence from the branch.

39. On May 18, 2002, Plaintiff did not speak to Anderson or to Gibbs.

40. Anderson, Plaintiff's supervisor, conferred with Fleet's employee relations representative, Stacey Micka, regarding Plaintiff's performance and absence on May 18, 2002.

41. The decision was made to terminate Plaintiff in accordance with Fleet's written performance expectations for employees on written 90-day final counsel warning for job performance and its absenteeism and tardiness policies.

42. Plaintiff was terminated because she had a record of poor attendance and tardiness and failed to report for work as scheduled while on a written 90-day final counsel warning for excessive absenteeism and tardiness.

43. On May 21, 2002, Anderson communicated the termination decision to Plaintiff.

44. During her employment with Fleet, Plaintiff was responsible for filling out her own time sheets, in accordance with Fleet policies and procedures regarding hours of work and paid time off.

45. Employees of Fleet who are non-exempt under the Fair Labor Standards Act ("FLSA"), are responsible for recording their start, stop and break times and for properly recording the reason for any absences on their bi-weekly time sheets.   Ex. 6, p. 6.

46. Plaintiff was an hourly, non-exempt employee under the FLSA.

47. The time sheets marked and entered in evidence as Exhibit 2 in this case are true copies of Plaintiff's time sheets that she maintained during and after her employment with Fleet.  These were produced by Plaintiff during discovery in this case.

48. At the time of her termination on May 21, 2002, Plaintiff had been tardy for work, excluding Saturdays, 16 days, since October 10, 2001.  When Saturdays are included for arrival after 9:45 a.m., Plaintiff was tardy for work 23 times between October 10, 2001 and May 21, 2002.

49. At the time of her termination on May 21, 2002, Plaintiff had failed to work and reported as sick at least 4 ½ days, since October 10, 2001.

50. At the time of her termination on May 21, 2002, Plaintiff had used 4 personal days (30 hours total), since October 10, 2001. Ex. 3 (weeks ending 2/1/02 Wednesday 8 hours, 2/22/02 Saturday 7 hours and 4/5/02 Saturday 7 hours) and Ex. M (week ending 2/15/02 Friday 8 hours).

51. Based on her part time schedule, Plaintiff was eligible for less than 16 hours of paid personal time each year.  Ex. 6, p. 24.

52. At the time of her termination on May 21, 2002, Plaintiff had used 2 bereavement days since October 10, 2001.

53. At the time of her termination on May 21, 2002, Plaintiff had used 5 vacation days (pro-rated for part time), since October 10, 2001.

54. Gibbs did not participate in the decision to terminate Plaintiff's employment with Fleet.

55. During her employment with Fleet, Plaintiff never complained internally to Fleet or externally to any government agency that she believed she was subjected to race discrimination, racial harassment or retaliation for a complaint of race discrimination or racial harassment.

56. Throughout her employment, Plaintiff was fully aware of the procedures for making a charge of discrimination at the state and federal agencies responsible for receiving such charges. Plaintiff failed to make any such charge against the Defendants during her employment with Fleet.

57. Plaintiff did not request, nor did she receive, a notice of right to sue from the Equal Employment Opportunity Commission.

58. Plaintiff has failed to offer any direct evidence of discrimination.

59. Plaintiff has failed to offer any evidence that the time sheets entered in evidence in this case (Ex. 2 and Ex. M) were tampered with by anyone.

60. Plaintiff has failed to offer any evidence of differential treatment of her vis-à-vis her co-workers with respect to Fleet's policy and procedures regarding attendance and punctuality.

61. Plaintiff has failed to offer any evidence of differential treatment of her vis-à-vis her co-workers with respect to Fleet's policy and procedures regarding Bank Secrecy Act compliance.

62. Plaintiff has failed offer sufficient evidence of differential treatment of her vis-à-vis her co-workers with respect to Fleet's policy and procedures regarding teller differences.

63. Plaintiff has failed to offer sufficient evidence to show that it was more likely than not that any teller difference was attributed to her because of her race.

64. Any remarks made by Anderson or Gibbs about race were stray remarks and were not made in circumstances that would support any inference of racial motivation for Plaintiff's termination.

**Facts As to Damages**

65. Plaintiff was employed as a Teller at Fleet from October 10, 2001 through May 21, 2002 at a rate of $11.00 per hour.

66. Plaintiff worked full time from October 2001 through January 2002, when she requested a part time schedule.

67. Plaintiff did not participate in Fleet's medical/health insurance plans at any time during her employment.

68. Plaintiff was a part time Teller at the time of her termination. She was working between 23 and 30 hours per week at a rate of $11 per hour.

69. Following her termination by Fleet on May 21, 2002, Plaintiff did not look for or apply for any positions with any potential employers.

70. Plaintiff collected unemployment compensation from the Commonwealth of Massachusetts from May 22, 2002 through September 2002, in the amount of $4,398.00.

71. In or around September 7, 2002, Plaintiff became employed by the Boston Public Schools at a rate of $15.16 per hour for approximately 30 hours per week.

72. Plaintiff has no lost wages resulting from her termination from the position of Teller with Fleet.

73. Plaintiff is unable to show that she would have received a transfer to another position within Fleet, had she not been terminated for her performance problems in her position as Teller.

74. Plaintiff did not suffer any compensable emotional distress causally related to the Defendants' conduct.

75. At the time Plaintiff claims she was suffering emotional distress as a result of the actions of Defendants, she was also claiming to be suffering emotional distress as a result of the actions of her former employer, the Massachusetts Bay Transportation Authority, against which she had active claims for employment discrimination pending in the United States District Court for the District of Massachusetts and the Court of Appeals for the First Circuit.

76. Plaintiff failed to mitigate her emotional distress by failing to seek medical treatment that was available to her.

77. Plaintiff has failed to offer any evidence of extreme or outrageous conduct of the character required in order to sustain an award of punitive damages.

## PROPOSED RULINGS OF LAW

### Intentional Discrimination on the Basis of Race,
### M.G.L. c. 151B, § 4 (1) and 42 U.S.C. § 1981 v. Fleet, Anderson and Gibbs
### 42 U.S.C. § 2000e v. Fleet

1. Massachusetts and federal laws prohibit discrimination in employment. M.G.L. c.151B, § 4(1) and 42 U.S.C. § 2000e make it unlawful for an employer to discharge an employee because of, *inter alia*, her race. M.G.L. c. 151B, §4(1), 42 U.S.C. § 2000e *et seq.*

2. Federal law also provides generally for equal rights under the law. 42 U.S.C. § 1981, as amended. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." For purposes of the statute "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §§ 1981(a) and (b).

3. In order to review the sufficiency of evidence presented in disparate treatment cases in which there is no direct evidence of discrimination, such as the case at bar, the Supreme Judicial Court has adopted the familiar three-part burden-shifting analysis set forth by the United States Supreme Court in claims arising under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§2000e *et seq*. <u>Matthews v. Ocean Spray Cranberries, Inc.</u>, 426 Mass. 122, 127-28. This three-part analysis is also applicable to claims of race discrimination in employment brought pursuant to Section 1981. <u>Straughn v. Delta Air Lines, Inc.</u>, 250 F.3d 23, 33 (1st Cir. 2001).

4. Under the analysis, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination based upon her race. <u>Matthews</u>, 426 Mass. at 128. Plaintiff must demonstrate,

by sufficient proof, that (1) she was within a protected class; (2) she adequately performed his job; (3) she was nevertheless dismissed or otherwise suffered an adverse job consequence; and (4) her employer sought someone of roughly equivalent qualifications to perform substantially the same work.  Straughn, 250 F.3d at 33,  Stephenson v. State Street Bank & Trust Co., 924 F.Supp. 1258, 1272, citing Byrd v. Ronayne, 61 F.3d 1026, 1030-31 (1st Cir. 1995); Lipchitz v. Raytheon Company, 434 Mass. 493 (2001); and Abramian v. President & Fellows of Harvard College, 432 Mass. 107 (2000).

5. Only after a plaintiff is able to establish her *prima facie* case, does any burden shift to the defendant, and then, it is only a burden to articulate a legitimate, non-discriminatory reason for its decision to discharge Plaintiff, and to produce credible evidence to show that the articulated reason was the real reason for the decision.  Matthews, 426 Mass. at 128, citing Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 442 (1995).

6. The defendant's burden is merely one of production and it is not onerous.  Id.  The defendant need not persuade the finder of fact that its decision was correct.  Id.  Indeed, the defendant has fulfilled its burden of production even where the reason for the decision may be "unsound or even absurd," or where the discharge may seem "arbitrary or unwise."  Id., citing Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 766-68 (1986).

7. After the defendant meets its burden of production, the burden returns to Plaintiff to persuade the court that the defendant's stated reason for Plaintiff's discharge is a pretext for discrimination.  Id.  At this stage of the analysis, Plaintiff must "produce evidence sufficient to support a verdict that it was more likely than not that the articulated reason was pretext for actual discrimination."  Id., quoting Blare, 419 Mass. at 447.

8.  The burden of proof under G.L. c. 151B, remains at all times with the Plaintiff, who must prove the termination was for a discriminatory reason.  <u>Stephenson</u>, 924 F.Supp. at 1273; <u>Matthews</u>, 426 Mass. at 128.

9.  As a matter of law, generalized "stray remarks," are not probative of pretext absent some discernible basis for assessing their temporal and contextual relevance.  <u>Straughn</u>, 250 F.3d at 35-36 quoting <u>McMillan v. Massachusetts Society for Prevention of Cruelty to Animals</u>, 140 F.3d, 288, 300-301 (1st Cir. 1999) cert. denied 525 U.S. 1105 (the probative value of stray remarks "is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question, or were made by nondecisionmakers").  See <u>Ayala-Gerena v. Bristol Myers</u>, 95 F.3d 86, 96-97 (1st Cir. 1996) (plaintiffs failed to show that comments referencing "black mafia" had anything to do with their racial or ethnic background); <u>Goldman v. First Nat'l Bank of Boston</u>, 985 F.2d 1113, 1116 (1st Cir. 1993) (plaintiff must clearly show the link between a comment suggestive of bias and the adverse employment action; improbable inferences and supported speculation do not suffice).

10. In order prevail at trial, a plaintiff must present more than her own, unsubstantiated, self-serving opinion as to her performance.  A plaintiff cannot rely on conclusory allegations to prevail in her claim.  See e.g. <u>Colbert v. Choate Health Management Inc.</u>, 776 N.E.2d 1040 (Mass. App. Ct. 2002); <u>Dartmouth Review v. Dartmouth College</u>, 889 F.2d 13, 16 (1st Cir.1989).

11. While individuals (who are not individual employers) may be liable under c. 151B for employment discrimination, such liability arises not under § 4(1), but only under §§ 4(4), 4(4A)

and 4(5).  M.G.L. c. 151B, §§ 4(1), 4(4), 4(4A) and 4(5).  See <u>Beaupre v. Cliff Smith & Associates</u>, 50 Mass.App.Ct. 480, 491 (2000).

**Procedural Prerequisites For Filing Claim Under Title VII in Court**

12. Among the procedures mandated by Congress under Title VII, are those established by 42 U.S.C. § 2000e-5(f)(1), which requires that as a precondition to suit by an aggrieved person, the Equal Employment Opportunity Commission ("EEOC") send notice to the aggrieved person of its dismissal of the charge or the termination of the EEOC's proceedings.

13. A complaining party "must satisfy two jurisdictional prerequisites to in order to bring suit under Title VII:  (a) a charge must be filed with the EEOC, and (b) statutory notice from the EEOC  of the right to sue muse be received."  <u>Local 179, United Textile Workers of America, AFL-CIO v. Federal Paper Stock Company</u>, 461 F.2d 849, 850-51(8th Cir. 1972), and cases cited. <u>See</u> <u>also</u>, <u>Movement for Opportunity and Equality v. General Motors Corp.</u>, 622 F.2d 1235, 1238 (1980) ("receipt of a right to sue letter is a prerequisite to the maintenance of suit under Title VII"), citing <u>Alexander v. Gardener-Denver Co.</u>, 415 U.S. 36, 47 (1974).

14. The issuance of this notice, which the EEOC refers to as "notice of right to sue" in its regulations, triggers the beginning of the 90 day period in which the aggrieved party may bring a civil action against the respondent(s) named in the charge.  42 U.S.C. § 2000e-5(f)(1).  <u>See also</u>, 29 CFR § 1601.28 (EEOC's regulations concerning "Notice of right to sue:  Procedure and authority").

15. The requirement that such notice issue from the EEOC is not onerous, and the EEOC's regulations provide that the aggrieved party may request such notice at any time following the filing of his/her charge.  29 CFR § 1601.28(a)(1).  In the first 180 days after the filing of the charge, however, such notice may issue upon request of the aggrieved party only after the

EEOC's determination that it will be unable to complete its administrative processing of the charge within 180 days and attaches a written certification to that effect.  29 CFR § 1601.28 (a)(2).

**Retaliation in Violation of G.L. c. 151B, § 4(4) v. Fleet, Anderson and Gibbs and
Retaliation in Violation of 42 U.S.C. § 2000e-3(a) v. Fleet**

16. Massachusetts General Laws Chapter 151B, Section 4(4) makes it unlawful for "any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five."  M.G.L. c. 151B, § 4(4).

17. Under federal law, it is unlawful for an employer to for an employer to "discriminate against any of his employees . . . , because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII.  42 U.S.C. § 2000e-3(a).

18. To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in protected conduct under federal or Massachusetts law; (2) she suffered an adverse employment action; and (3) there is a causal connection between Plaintiff's protected activity and the adverse employment action.  McMillan, 140 F.3d 288.

19. To succeed in a retaliation claim under Chapter 151B, Plaintiff must establish the basic fact that she was subjected to an adverse employment action because of her protected activity.  Blockel v. J.C. Penney Co., Inc., 337 F.3d 17 (1st Cir. 2003).

20. The burden of persuasion rests at all times with the Plaintiff in a retaliation action. Mole v. University of Massachusetts, 58 Mass.App.Ct. 29 (2003).

21. To prevail where there is no evidence of discriminatory animus, Plaintiff filing a retaliation claim must both establish a prima facie case and prove that the defendants' stated reasons for the employment action were pretextual. Id.

**Intentional Interference with Contractual Relations**
**v. Anderson and Gibbs**

22. Employment is presumed at-will unless an express or implied contract exists governing the terms and conditions of employment. Jackson v. Action for Boston Community Development, Inc., 403 Mass. 8, 9 (1988).

23. In order to prevail on a claim for intentional interference with contract of employment against Anderson and Gibbs, Plaintiff must prove (1) that she had an employment contract with Fleet, (2) that Anderson and/or Gibbs knowingly induced Fleet to break that contract, (3) that Anderson's and/or Gibbs' interference, in addition to being intentional, was improper in motive or means, and (4) that Plaintiff was harmed by Anderson's and/or Gibbs' actions. Shea v. Emmanuel College, 425 Mass. 761, 764 (1997). See also Buster v. George W. Moore, Inc., 438 Mass. 635, 652 (2003).

24. A supervisor is permitted to interfere with Plaintiff's relationship with her employer "unless [the supervisor] acted out of malevolence, that is, with 'actual' malice." Boothby v. Texon, Inc., 414 Mass. 468, 487 (1993) quoting from Gram v. Liberty Mutual Insurance Co., 384 Mass. 659, 663 (1981). See also King v. Driscoll, 418 Mass. 576, 587 (1984) (the improper motive or means required is actual malice).

25. Implied malice is not sufficient to sustain a claim for intentional interference with contractual relations. Gram, 384 Mass. at 663.

26. A personal dislike will not warrant an inference of the requisite ill will. King, 418 Mass. at 587, citing Boothby v. Texon, Inc., 414 Mass. 468, 487 (1993).

27. Derogatory comments and uncivil behavior will not warrant an inference that the defendant acted with ill will of the nature necessary to show actual malice. Alba v. Sampson, 44 Mass.App.Ct. 311, 316 (1998).

28. The motivation of personal gain, including financial gain, is not enough to satisfy the improper interference requirement. United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990).

29. The requisite malice in this context, which must be proved to prevail, is a spiteful, malignant purpose unrelated to the legitimate corporate interest of the employer. Weber v. Community Teamwork, Inc., 434 Mass. 761, 782 (2001); King, 418 Mass. at 587.

30. To be reasonable, an inference of malice must be based on probabilities and not mere possibilities. Gram, 384 Mass. at 663.

**Emotional Distress Damages**

31. Emotional distress damage awards, when made, should be fair and reasonable, and proportionate to the distress suffered. An award must rest on substantial evidence and its factual basis must be made clear on the record. Stonehill College v. Massachusetts Commission Against Discrimination, 441 Mass. 549, 576 (2004).

32. Plaintiff must prove a sufficient causal connection between a defendant's unlawful act and her emotional distress. Emotional distress existing from circumstances other than the actions of the defendant, or from a condition existing prior to the unlawful act, is not compensable. Id.

33. A finding of discrimination or retaliation, by itself, is not sufficient to permit an inference of, or a presumption of, emotional distress.  To be compensable, emotional distress must be proved. <u>Id.</u>

### Punitive Damages

34. Punitive damages may be awarded for employment discrimination under Massachusetts law only if the defendant's conduct is found to be outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others, including the plaintiff." <u>Abramian v. President and Fellows of Harvard University</u>,  432 Mass. 107, 119 (2000) citing <u>Darrt v. Browing Ferris Industries</u>,  427 Mass. 1, 17a (1998) quoting Restatement (Second) of Torts, § 908(2) (1979).

Defendants reserve their rights to revise and amend this request for findings of fact and rulings of law in response to the evidence and issues presented at trial.

                FLEET NATIONAL BANK, BRIAN
                GIBBS AND KIMBER ANDERSON,
                DEFENDANTS
                By their attorneys,

                 /s/ Siobhan M. Sweeney
                George P. Kostakos (BBO# 557919)
                Edwards & Angell, LLP
                2800 Financial Plaza
                Providence, RI  02903
                (401) 528-5864
                 (401) 528-5859 (fax)

                Siobhan M. Sweeney (BBO # 562118)
                Edwards & Angell, LLP
                101 Federal Street
                Boston, MA  02210
                (617) 439-4444
                (617) 439-4170 (fax)

### Certificate of Service

I hereby certify that this document was served on counsel of record for plaintiff, Winston Kendall, through the court's electronic filing.

                /s/ Siobhan M. Sweeney